# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN ASSOCIATION OF HOME
BUILDERS, ASSOCIATED BUILDERS AND
CONTRACTORS OF MICHIGAN, and
MICHIGAN PLUMBING AND MECHANICAL
CONTRACTOR ASSOCIATION,

UNPUBLISHED
September 28, 2017

Plaintiffs-Appellants,

v

No. 331708
Oakland Circuit Court
LC No. 2010-115620-CZ

CITY OF TROY,

Defendant-Appellee.

Before: O'BRIEN, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Plaintiffs appeal as of right the trial court's opinion and order denying plaintiffs' motion for partial summary disposition and granting defendant's motion for summary disposition, following remand from the Supreme Court.[1] We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case originated on December 15, 2010, when plaintiffs filed a two-count complaint alleging that defendant's collection of building department revenue that exceeded the amount owed in accordance with its SAFEbuilt contract,[2] and the deposit of the excess monies into defendant's general fund, violated the Single State Construction Code Act (CCA), MCL 125.1501 *et seq.*, specifically MCL 125.1522(1). In addition, plaintiffs contended that

---

[1] *Mich Ass'n of Home Builders v City of Troy*, 497 Mich 281; 871 NW2d 1 (2015).

[2] As explained by the trial court: "Under the contract, Safe Built [sic] agreed to perform most of the functions of Defendant's building department, such as inspections and plan reviews. In exchange, Defendant agreed to pay Safe Built [sic] 75-80% of the revenue Defendant collected for building department services . . . . Defendant deposited the remainder of the revenue into its general fund" to compensate or repay for deficits incurred by the building department in previous years "that were absorbed by the general fund."

defendant's collection of building department fees that exceeded the amount owed under defendant's contract with SAFEbuilt comprised a disguised tax in violation of the Headlee Amendment, Const 1963, art 9, § 31. After the parties filed cross-motions for summary disposition, the trial court granted summary disposition in favor of defendant, concluding that it lacked jurisdiction to hear the dispute where plaintiffs had not exhausted their administrative remedies as required by the CCA. After plaintiffs appealed to this Court and this Court affirmed the trial court's ruling, plaintiffs sought and were granted leave to appeal, where the Supreme Court determined that the trial court erred by ruling that plaintiffs must exhaust the administrative remedy set forth in MCL 125.1509b, and remanded to the trial court. *Mich Ass'n of Home Builders v City of Troy*, 497 Mich 281, 283; 871 NW2d 1 (2015).

This appeal follows the remand of this matter to the trial court and the resumption of summary disposition proceedings in that forum. Following remand, plaintiffs filed a motion for summary disposition pursuant to MCR 2.116(C)(10), and defendant moved for summary disposition pursuant to MCR 2.116(I)(2). As relevant to this appeal, the parties advanced arguments in support of their respective positions regarding whether (1) defendant's Building Department's assessment and collection of fees complied with MCL 125.1522(1) and, (2) the fees assessed violated the Headlee Amendment. The trial court concluded that defendant had fully complied with MCL 125.1522(1), and that the fees at issue did not contravene the Headlee Amendment. Plaintiffs now appeal as of right.

## II. MCL 125.1522(1)

In support of their argument that summary disposition was improperly granted, plaintiffs assert that the trial court incorrectly interpreted the language of MCL 125.1522(1). "This Court reviews de novo a trial court's decision on a motion for summary disposition." *Cotton v Banks*, 310 Mich App 104, 111; 872 NW2d 1 (2015). Specifically:

> We review de novo a trial court's decision regarding a motion for summary disposition under MCR 2.116(C)(10), which tests the factual sufficiency of a claim. In deciding the motion, the trial court must view the substantively admissible evidence submitted up to the time of the motion in a light most favorable to the party opposing the motion. Summary disposition may be granted if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust Bd of Trustees v City of Pontiac No 2*, 309 Mich App 611, 617-618; 873 NW2d 783 (2015) (citations and quotation marks omitted).]

Similarly, "[s]ummary disposition may be granted in favor of an opposing party under MCR 2.116(I)(2) if there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009). Questions of law pertaining to issues of statutory interpretation and "the application of our state Constitution[ ]" are also reviewed de novo. *Mayor of Cadillac v Blackburn*, 306 Mich App 512, 516; 857 NW2d 529 (2014).

In accordance with the general recognized rules of statutory construction:

> When interpreting a statute, our primary goal is to give effect to the intent of the Legislature. If the language of a statute is unambiguous, we presume the Legislature intended the meaning expressed in the statute. A statutory provision is ambiguous only if it conflicts irreconcilably with another provision or it is equally susceptible to more than one meaning. A statute is not ambiguous merely because a term it contains is undefined or has multiple definitions in a dictionary, especially when the term is read in context. When construing a statute, we must assign every word or phrase its plain and ordinary meaning unless the Legislature has provided specific definitions or has used technical terms that have acquired a peculiar and appropriate meaning in the law. [*Blackburn*, 306 Mich App at 516 (citations and quotation marks omitted).]

Plaintiffs assert that the application of the user fee surplus to offset an alleged shortfall for the Building Department is in violation of MCL 125.1522(1), which provides as follows:

> The legislative body of a governmental subdivision shall establish reasonable fees to be charged by the governmental subdivision for acts and services performed by the enforcing agency or construction board of appeals under this act, which fees shall be intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services, including, without limitation, those services and acts as, in case of an enforcing agency, issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy, and, in case of a board of appeals, hearing appeals in accordance with this act. The enforcing agency shall collect the fees established under this subsection. The legislative body of a governmental subdivision shall only use fees generated under this section for the operation of the enforcing agency or the construction board of appeals, or both, and shall not use the fees for any other purpose.

According to plaintiffs, this statute requires that the fees charged be "reasonable" and "bear a reasonable relation to the cost" of the building services provided, as well as requires the fees generated to be used for the "operation" of the Building Department and not "for any other purpose." More specifically, plaintiffs argue that the statute requires the fees to be used for current expenses incurred in operating the Building Department and cannot be applied, as is being done by defendant, to compensate for past costs incurred.

As a starting point, we reject plaintiffs' assertion that the plain language of MCL 125.1522(1) precludes defendant's application of surplus user fees to historical shortfalls the Building Department has incurred. We rest this conclusion on the plain language of MCL 125.1522(1), which simply does not contain any wording that would support plaintiffs' interpretation.

> When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute.

We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, we presume that the Legislature intended the meaning clearly expressed – no further judicial construction is required or permitted, and the statute must be enforced as written. *In re Petition of Attorney General for Investigative Subpoenas*, 282 Mich App 585, 591; 766 NW2d 675 (2009) (citations and quotation marks omitted).

Notably, the first sentence of MCL 125.1522(1) provides for the establishment of fees "for acts and services performed . . . ." Our reading of the statutory language confirms that use of the term "performed" can be understood to mean future, current, and past services provided. We reach this conclusion where there is no restricting or limiting language preceding the word "performed" indicating a temporal constraint, such as "currently performed," "to be performed," or "previously performed." Moreover, the final sentence of MCL 125.1522(1), indicating "[t]he legislative body . . . shall only use fees generated under this section for the operation of the enforcing agency . . ." likewise fails to suggest a temporal restriction pertaining to the word "operation." Thus, we agree with defendant that "the operation" of defendant's Building Department can denote a current, past, or future action. Although the final sentence of MCL 125.1522(1) does restrict the use of "fees generated" to "the operation of the enforcing agency . . . and . . . not . . . for any other purpose[,]" we are not persuaded that defendant's action in applying surplus fees to past shortfalls is inconsistent with this language. Put another way, if the excess or surplus fees are used to cover expenses or costs incurred with the running or "operation" of the building department, currently or for past shortfalls incurred, defendant's conduct remains in conformance with MCL 125.1522(1).

Here, plaintiffs' restrictive interpretation of MCL 125.1522(1) is not supported by the plain language of the statute, *Paschke v Retool Indus*, 445 Mich 502, 511; 519 NW2d 441 (1994), where it does not evidence a temporal component associated with the use of the surplus fees or the operation of the building department. "When the Legislature enacts laws, it is presumed to know the rules of statutory construction and therefore its use or omission of language is generally presumed to be intentional." *Carson City Hosp v Dep't of Community Health*, 253 Mich App 444, 447-448; 656 NW2d 366 (2002) (citation omitted).

We next address plaintiffs' contention that the accumulation of a surplus impliedly indicates that defendant's fees are not reasonable because they exceed the cost of the service being provided and, therefore, do not meet the requirements of MCL 125.1522(1). This requires us to determine if: (a) the fees are "reasonable" and bear a "reasonable relation to the cost" for the service provided, MCL 125.1522(1), and (b) if reasonable, whether any surplus that occurs is applicable to prior shortfalls. To the extent that plaintiffs' arguments can be interpreted as a suggestion that any monies generated for Building Department services beyond those necessary to fulfill defendant's contractual obligations with SAFEbuilt comprise a surplus and, therefore, are unreasonable, they are without merit.

The language of MCL 125.1522(1) specifically acknowledges that fees encompass not only "reasonable fees . . . charged . . . for acts and services performed by the enforcing agency[,]" but also "include[ ] overhead[.]" John Lamerato, defendant's former assistant city manager for finance and administration, testified that defendant incurs additional expenses for

operation of the Building Department that exceed those attributable to SAFEbuilt that are "offset with the revenue" generated. As such, it would be an oversimplification to assert that any and all monies generated by the Building Department in excess of those attributable to the SAFEbuilt contractual agreement with defendant comprise a surplus. Instead, they comprise a cost of doing business for the Building Department and can be attributed, in accordance with MCL 125.1522(1), to "the operation of the enforcing agency[.]" For example, Thomas Darling, CPA, as defendant's interim director of financial and administrative services, averred in his November 2, 2011 affidavit that costs incurred for the activities of the Building Department, aside from those contractually generated with SAFEbuilt, include maintaining a city employee as "the building code official," and that the costs associated with the employment of this individual "are included as a component of indirect costs[.]"

With regard to the reasonableness of the fees, we acknowledge that initially, the first sentence of MCL 125.1522(1) appears to support plaintiffs' position. As noted previously, MCL 125.1522(1) provides, in pertinent part:

> The legislative body . . . shall establish *reasonable fees to be charged* by the governmental subdivision *for acts and services performed* by the enforcing agency . . . which *fees shall be intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services*, including . . . those services and acts [such as the] issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy . . . . [MCL 125.1522(1) (emphasis added).]

The statutory provision obviously permits defendant's Building Department to charge "reasonable fees . . . for acts and services performed[.]" As a preliminary matter, the term "reasonable" is not statutorily defined. See MCL 125.1502a (setting forth definitions pertaining to the CCA). MCL 125.1522(1), however, by its plain terms, does provide additional guidance in our analysis. Specifically, by indicating that the "reasonable fees" are "to bear a reasonable relation to the cost, including overhead, . . . of the acts and services[ ]" to be provided, there exists an implication that the fees should cover the cost of the services received in exchange for the fee being paid. In other words, the statutory language indicates that there must be a determinable relationship between the fee charged for a service and the delivery of that service. Yet contrary to plaintiffs' position, the existence of a surplus does not automatically result in a determination that the fees charged are unreasonable and, therefore, do not satisfy the dictates of MCL 125.1522(1). A surplus may occur within a particular financial year, not because the fees are unreasonable, but simply because the services being provided have not entailed the amount of time, energy, or resources normally, or on average, required for the delivery of the particular service. To determine the reasonableness of the fees would require a breakdown and analysis for each type of fee to determine if the surplus is attributable to all or a majority of the services provided, such that no one service systematically produces a surplus, or whether any surplus is routinely generated by the fees associated with a particular service. If the fees for a particular service consistently generate revenue exceeding the costs for the service, the reasonableness of the fee for that service would be suspect. This, however, has not been demonstrated.

As part of their argument, plaintiffs suggest that defendant has incorporated within its fees structures an amount to compensate for the inadequacy of prior fees resulting in shortfalls. The inclusion of such a figure, according to plaintiffs, would violate MCL 125.1522(1), and would render the fee unreasonable because it would not bear a "reasonable relation" to the cost of the service provided. In other words, it is a violation of MCL 125.1522(1) to require current individuals or entities paying for the services of the Building Department to also pay or provide reimbursement for the inadequacy of payments other users of the Building Department's services previously made. Plaintiffs have not come forward, however, with any evidence to demonstrate that, in deriving the fees to be charged, an amount has been included to compensate for prior shortfalls in defendant's calculation. Instead, testimony elicited from Darling identified the listing of revenues associated with defendant's Building Department in detail.

Under these circumstances, we conclude that plaintiffs have failed to demonstrate the absence of a "reasonable relation" of the fees charged to the services performed, relying primarily on the existence of a surplus to provide proof of their premise.[3]

While accepting the proposition that some amount of a surplus can be generated even if the fees are reasonable, the next question is whether it is permissible, under MCL 125.1522(1), to use that surplus or overage for the payment of past shortfalls incurred. Again, the sole statutory restriction MCL 125.1522(1) imposes is that "[t]he legislative body of a governmental subdivision shall only use fees generated under this section for the operation of the enforcing agency . . . and shall not use the fees for any other purpose." Plaintiffs argue that because defendant's yearly budgets must balance and there is no formal loan document evidencing defendant's borrowing from the general fund to subsidize and maintain the Building Department and necessitating repayment, the placement of any surplus monies into the general fund does not comport with the mandate that such funds only be used to operate the Building Department. Defendant asserts that the accounting procedures for the monies at issue and their application to reduce the cumulative historical shortfalls taken from the general fund required to maintain the operation of the Building Department fully comport with the statute and are permissible. Further, Darling testified that Building Department expenditures are segregated or reported "as a department . . . inside the general fund."

In addressing implementation of the CCA, the Department of Treasury[4] has recognized the possibility of the collection of "excess fees," defined as "excess of revenue over

---

[3]Plaintiffs have generally asserted that defendant's financial reports overstate expenses and understate revenue for the Building Department. However, our review of the record did not yield evidence to contradict testimony elicited on behalf of defendant regarding its methods of accounting and asserting the accurate representation of the fees and service costs collected and expenditures incurred in the operation of the Building Department.

[4] Plaintiffs and defendant both rely on a 2006 Treasury Department document. According to this document, which responds to questions pertaining to the CCA and its effectuation, a separate fund for building department fees is mandatory "unless your local unit's fee structure is not intended to recover the full cost of the enforcing agency and your local unit has the ability to

expenditures," which are to be "included in the separate fund balance or retained earnings of the separate special revenue fund or enterprise fund." It was further indicated that a general fund could be used to appropriate monies to compensate for a shortfall. Treasury also acknowledged the possibility of the collection of excess fees, requiring only their segregation with the expectation that any such funds will be carried over into the next fiscal year. Read in conjunction with the directives pertaining to a "local unit's accounting system," requiring accumulated totals for (a) revenues generated, (b) costs incurred, and (c) "cumulative excess revenues over or (under) expenditures," Treasury implicitly recognized that surpluses can occur and that they may be used to offset shortfalls in different fiscal years. This is consistent with this Court's ruling in *Trahey v City of Inkster*, 311 Mich App 582, 597-598; 876 NW2d 582 (2015), a case involving the reasonableness of utility rates, where this Court recognized, in the context of a municipality's water and sewer department, that "[t]imely payment of the . . . department's debt was necessary for its continued operation, and therefore constituted part of the actual cost of providing the service." Absent evidence demonstrating "that the method chosen by the city to maintain its operations and repay its debts was unreasonable, and absent evidence of impropriety," this Court refused to "independently scrutinize the municipal ratemaking methods employed by the city." *Id.* As such, plaintiffs' contention that placement of the surplus fees into the general fund and their use to offset prior shortfalls of the Building Department is in violation of MCL 125.1522(1), is without merit.

### III. HEADLEE AMENDMENT

Plaintiffs' final argument is that defendant's charging of fees that exceed the current operational costs of its Building Department, and placing the surplus monies in its general fund, violate the Headlee Amendment because it comprises a disguised tax.

The determination of "[w]hether . . . [a] service charge . . . is a 'tax' or a 'user fee' is a question of law that this Court reviews de novo." *Bolt v City of Lansing*, 459 Mich 152, 158; 587 NW2d 264 (1998) (citation omitted).

The Headlee Amendment provides, in pertinent part, as follows:

Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. [Const 1963, art 9, § 31.]

---

track the full costs and revenues of this activity without creating a separate fund." While defendant presented evidence that its accounting system is sufficiently sophisticated to "track the full costs and revenues," what has not been definitively determined is whether the "fee structure is [ ] intended to recover the full cost of the enforcing agency." While Treasury indicated a preference for the creation of "a separate fund" with the allocation of "all related overhead costs to this fund[ ]" to achieve a "fund balance [that] will be separate from the General Fund[,]" this method of accounting was not made mandatory.

Standards pertaining to judicial review of constitutional provisions are explained as follows:

> The primary goal of the judiciary when construing Michigan's Constitution is to ascertain the purpose and intent of the provision at issue. To do so, courts must apply the original meaning attributed to the words of a constitutional provision by its ratifiers, i.e., the most obvious commonly understood meaning the people would have assigned the words employed at the time of ratification. This is known as the rule of common understanding. Under the rule of common understanding, we must apply the meaning that, at the time of ratification, was the most obvious to the common understanding, the one that reasonable minds and the great mass of the people themselves, would give it. Thus, words should be given their common and most obvious meaning, and consideration of dictionary definitions used at the time of passage for undefined terms may be appropriate. While historical records such as those concerning the debate that occurred at the constitutional convention are relevant, they are not controlling. Furthermore, all provisions must be read in light of the whole document and no provision should be read to nullify another. [*Blackburn*, 306 Mich App at 517 (citations and quotation marks omitted).]

Plaintiffs argue that the surplus fees charged by defendant constitute a mechanism to generate revenue and do not serve a regulatory purpose. They assert that at least a portion of the building fees are compulsory because the fees charged are being used to offset fees that were historically discounted for others, thereby resulting in the current payers paying the fee to exercise a valuable property right.

The Supreme Court has recognized that "[t]here is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. Further complicating the matter is the failure of the Headlee Amendment to define the terms "tax" or "fee." *Id*. However, "[g]enerally, a 'fee' is 'exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit.' A 'tax,' on the other hand, is designed to raise revenue." *Id*. at 161 (citations omitted). The *Bolt* Court identified "three primary criteria to be considered when distinguishing between a fee and a tax." *Id*. Specifically, the criteria to be evaluated are: (a) "a user fee must serve a regulatory purpose rather than a revenue-raising purpose[,]" (b) "user fees must be proportionate to the necessary costs of the service[,]" as well as (c) "voluntariness." *Id*. at 161-162 (citations omitted). Additionally, "[a] proper fee must reflect the bestowal of a corresponding benefit on the person paying the charge, which benefit is not generally shared by other members of society." *Id*. at 164 (citation and quotation marks omitted). Subsequently, this Court in *Graham v Twp of Kochville*, 236 Mich App 141, 151; 599 NW2d 793 (1999), explained that the "criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge at issue is not a fee." In particular, a "lack of volition does not render a charge a tax, particularly where the other criteria indicate the challenged charge is a user fee and not a tax." *Wheeler v Charter Twp of Shelby*, 265 Mich App 657, 666-667; 697 NW2d 180 (2005) (citations omitted).

Using the *Bolt* criteria, we conclude that the fees at issue are regulatory in nature. The CCA directs that a state construction code be adopted that shall govern "the construction, use,

and occupation of buildings and structures[ ]" throughout the state. MCL 125.1504(1). "[T]he purpose of the construction code act is not to protect the public against harm by establishing construction standards and an inspection regime, but merely to establish the authority of the director of the . . . Department of Labor and Economic Growth, to 'prepare and promulgate' a state construction code consistent with, and protective of, the 'health, safety, and welfare of the occupants and users of buildings and structures.' MCL 125.1504(1) and (3)(c)." *Rakowski v Sarb*, 269 Mich App 619, 628 n 4; 713 NW2d 787 (2006). A recognized result of the enactment of the CCA, however, is the provision of "minimum construction standards for safety purposes." *Gackler Land Co, Inc v Yankee Springs Twp*, 138 Mich App 1, 12-13; 359 NW2d 226 (1984), aff'd 427 Mich 562 (1986). The generation of some revenue is not preclusive if the fee or charge "is in support of the underlying regulatory purpose." *USA Cash #1, Inc v City of Saginaw*, 285 Mich App 262, 280; 776 NW2d 346 (2009) (citations omitted).

The fees charged by defendant are related to or associated with the provision of specific services by the Building Department and "bear[ ] the classic characteristics of a user fee[,]" *Wheeler*, 265 Mich App at 665, because they are applied to offset the costs incurred for the approval of various construction projects in the municipality to assure their compliance with various codes and requirements. The fee is "presume[d]" to be reasonable until demonstrated otherwise, which has not occurred through plaintiffs' proofs. *Id.* at 665-666. Further, the fees are charged only to individuals or entities seeking the particular services provided and are not imposed on all persons in the community. In other words, "only those who receive the mandated service pay for that service[.]" *Id.* at 666. Additionally, a municipality is entitled to generate some additional monies through user fees for such things as capital improvements or capital reserves. *Jackson Co v City of Jackson*, 302 Mich App 90, 110-111; 836 NW2d 903 (2013). Here, as recognized in our discussion of the statutory issue, defendant has established that the additional funds available after payment of the contractor's services go towards a debt incurred by the building department for past services. This holds especially true because these "reserves are funded by true user fees closely calibrated to the actual use of the service or a price paid for a commodity." *Id*. at 111.

This last point is what differentiates this case from *Bolt* and *Jackson Co*. In both those casesc the offending party implemented a fee based system to either raise revenue to support a new system (*Bolt*) or to replace declining general fund revenue that used to support the water system (*Jackson Co*). As the *Bolt* Court put it, the fee in that case "constitutes an investment in infrastructure as opposed to a fee designed simply to defray the costs of a regulatory activity." *Bolt*, 459 Mich at 163. Here, however, the same fee has been charged for many years to support the same building department, and defendant did not implement this fee to make up for, or save from spending, tax revenue. Indeed, the only difference now is that the costs have declined, resulting in some additional funds available to reduce building department debt. Additionally, unlike in both *Bolt* and *Jackson Co*, where *all* the residents were charged a fee regardless of the need, here the only ones paying the fee are those that are utilizing the services of the department. And there is no evidence that any of those additional funds are used for anything other than to pay down the debt incurred by the department in years past. There is no subterfuge in charging a consistent fee for the same service to only those who ask for that service. *Id*. at 166.

There are two ways to evaluate the third criterion of volition. Defendant contends the fees are voluntary because only those individuals seeking to procure certain services are subject

to the charges; the fees are not paid by all of defendant's residents.  On the other hand, plaintiffs assert that the fees are not voluntary, impinging on property ownership rights because they must be paid in order to engage in certain uses or construction on privately owned property.  To be deemed voluntary "the payer of the fee must be able to refuse or limit its use of the service or benefit." *USA Cash #1*, 285 Mich App at 280 (citation omitted).  As the *Bolt* Court pronounced, the " 'mandatory user fee' has all the compulsory attributes of a tax, in that it must be paid by law without regard to the usage of a service, and becomes a tax lien of the property." *Bolt*, 459 Mich at 169 (citation and quotation marks omitted).  None of those characteristics are present with this fee paid only by those who want—or need—the services of the building department.

## IV. CONCLUSION

The trial court correctly granted summary disposition in favor of defendant and denied plaintiffs' motion for partial summary disposition.

Affirmed.  Defendant, as the prevailing party, may tax costs pursuant to MCR 7.219(A).


/s/ Colleen A. O'Brien
/s/ Christopher M. Murray